OPINION OF THE COURT
Ralph A. Beisner, J.
In this proceeding brought pursuant to Mental Hygiene Law § 15.31, the petitioner seeks his immediate release from Wassaic Developmental Center (WDC) where he is presently retained involuntarily pursuant to Mental Hygiene Law § 15.27 (a). A hearing was held before the court at which James Baker, Ph D, and petitioner’s two sisters, Debra Sylvester and Tracy Shultis, testified on behalf of WDC. The petitioner did not testify. Based on the testimony at the hearing, the court makes the following findings of facts.
Findings of Fact
The petitioner is 33 years old. At the age of 20 petitioner was involved in a car accident in which the truck he was driving *3 struck a tree. Petitioner was thrown through the windshield and sustained a brain stem injury, a spinal cord injury and a broken leg. He was in a coma for almost three months. As a result of his injuries Mr. Winne is now partially paralyzed and wheelchair-bound. In 1993 when petitioner was 27 years old he was tested and found to have mild mental retardation with an IQ of 68.
Petitioner had left school at the age of 16 and had been working in construction and roofing for three to four years before the accident. He had lived with his sister’s family for several years, but had been living on his own for a few weeks immediately prior to the accident.
Petitioner had never exhibited aggressive or violent behavior until the accident. Since the brain stem injury the petitioner’s behavior has changed drastically. Over the last 10 years he has exhibited a violent temper. He has often attacked other people. Mr. Winne on one occasion obtained a gun and said he wanted to shoot his mother; fortunately he did not have access to ammunition. He has hit his younger sister, Ms. Shultis, because she would not get him alcohol. Therapy aides who have been assigned to assist Mr. Winne in daily living tasks have quit because of his temper and the living conditions they must endure while working with him.
Although this was a close family, only two of petitioner’s sisters, Tracy Shultis and Debra Sylvester, are continuing to help him. His other siblings no longer have contact with him because they cannot deal with his condition and his temper. He has a history of alcohol and drug abuse. Petitioner continually states that he will kill himself or that he will hurt other people if he does not get what he wants. Petitioner was admitted to a hospital on two occasions in 1998 for renal failure as the result of ingesting motor vehicle antifreeze.
For the last four or five years petitioner has been living on his own. His housing is roach-infested and filthy. Petitioner is unable to bathe or feed himself. Mr. Winne was evicted from his apartment because he was not paying his rent and was apparently using the apartment for prostitution and drug use. His sisters found him living in ajnotel which had a bathroom into which he could not fit his wheelchair. Petitioner’s two sisters have attempted to take care of his hygiene and feeding. On occasion they have had to call the police because of the petitioner’s violent acts.
In early February 2000, petitioner was admitted to Benedictine Hospital in Kingston, New York, because of injuries which *4 he sustained while living at the motel. Petitioner was transferred from Benedictine Hospital to WDC pursuant to Mental Hygiene Law § 15.27.
According to James Baker, Ph D, a licensed psychologist employed at WDC, petitioner’s history since the accident reveals self-destructive and violent behavior towards himself and others. Petitioner abuses drugs and alcohol and refuses treatment. Petitioner is unable to understand his need for treatment because his judgment is so impaired. The psychologist opined that in-patient care and treatment are essential to petitioner’s welfare at this time. He is unable to provide for the necessities of daily living, such as shelter, food and hygiene.
Conclusions of Law
It is undisputed that petitioner was admitted to WDC pursuant to Mental Hygiene Law § 15.27. Article 15 of the Mental Hygiene Law is entitled “Admission of the Mentally Retarded to Schools.” That statute provides that the director of a school such as WDC may receive and retain therein, as a resident, any person alleged to be mentally retarded and in need of involuntary care and treatment upon specified medical certificates. Mental Hygiene Law § 1.03 (11) defines a “school” as “the in-patient service of a developmental center or other residential facility for the mentally retarded and developmentally disabled * * * or a facility for the residential care, treatment, training, or education of the mentally retarded and developmentally disabled.”
Petitioner contends that he is, at most, developmentally disabled but he is not mentally retarded. Mental Hygiene Law § 15.27 only provides that individuals who are mentally retarded can be admitted to a school on an involuntary basis.
The issue of first impression presented by this case hinges upon the distinction between “mental retardation” and “developmental disability” and their use in the statutory scheme of involuntary commitment to State developmental schools.
Mental retardation is defined in Mental Hygiene Law § 1.03 (21) as “subaverage intellectual functioning which originates during the developmental period and is associated with impairment in adaptive behavior.” (Emphasis supplied.)
Since the Mental Hygiene Law does not provide a time frame for the term “developmental period,” petitioner relies on the clinical definition of “mental retardation” set forth in the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV *5 [4th ed 1994]). The DSM-IV states that the onset of mental retardation must occur before age 18.
Mental Hygiene Law § 1.03 (22) defines “developmental disability” as a disability of a person which: “is attributable to mental retardation, cerebral palsy, epilepsy, neurological impairment or autism” (Mental Hygiene Law § 1.03 [22] [a] [1]), and which “originates before such person attains age twenty-two” (Mental Hygiene Law § 1.03 [22] [b]). In contrast to the age requirement contained in the definition of developmental disability in Mental Hygiene Law § 1.03 (22), the statutory definition of mental retardation only requires that the subaverage intellectual functioning originate during the developmental period (Mental Hygiene Law § 1.03 [21]). The Legislature did not place an age limit on the term “developmental period” in the definition of mental retardation.
The court rejects petitioner’s argument that the developmental period must be limited by the age limit of 18 years as found in the clinical definition of mental retardation in the DSM-IV. The development of academic, social, interpersonal, self-care and work-related skills occurs at different times and at different rates for individuals. This 20 year old who was beginning to live on his own and function independently in society was certainly in his developmental period when this tragic motor vehicle accident occurred. As a result of the accident he has developed subaverage intellectual functioning with an IQ of 68 and very impaired adaptive behavior. Thus, petitioner’s condition satisfies the definition of mental retardation as set forth in Mental Hygiene Law § 1.03 (21) and petitioner’s involuntary commitment to WDC under Mental Hygiene Law § 15.27 is proper.
Since the court has found that the petitioner is mentally retarded pursuant to the definition found in Mental Hygiene Law § 1.03 (21) and that his mental retardation originated during his developmental period and before he was 22 years old, it is not necessary to address petitioner’s contention that he is at most developmentally disabled and only those persons who are mentally retarded can be involuntarily admitted to WDC.
Yet this particular case gives cause to examine the entire legislative scheme of article 15 of the Mental Hygiene Law and the purpose of the legislation. A logical reading of the entire statute must permit the conclusion that those who are developmentally disabled may also be involuntarily received and retained at developmental centers such as WDC.
*6 Mental Hygiene Law § 1.03 (11) defines school as “the inpatient service of a developmental center or other residential facility for the mentally retarded and developmentally disabled * * * or a facility for the residential care, treatment, training, or education of the mentally retarded and developmentally disabled” (emphasis added). Voluntary admission to a school is governed by Mental Hygiene Law § 15.03 which provides that a mentally retarded person shall be admitted to a school. The statute makes no reference to persons who are developmentally disabled, but it is clear from the language of Mental Hygiene Law § 1.03 (11) that mentally retarded and developmentally disabled persons may be admitted to developmental centers such as WDC.
As a matter of statutory interpretation, sections relating to the same subject matter are deemed to be in pari materia and “ ‘construed together as though forming part of the same statute’ ” (Khela v Neiger, 85 NY2d 333, 336, citing McKinney’s Cons Laws of NY, Book 1, Statutes § 221 [a], [b]). When viewed in the light of both statutes, it is apparent that the term “mentally retarded” is intended to be inclusive rather than exclusive. Otherwise, those persons with developmental disabilities could not be admitted to residential care at the developmental centers. The statutes would be contradictory. The same analysis must also be applied to involuntary admissions under Mental Hygiene Law § 15.27. Although the language of Mental Hygiene Law §§ 15.27 and 15.33 refers to those persons alleged to be mentally retarded, this phrase must be read to be inclusive of individuals with developmental disabilities.
For the foregoing reasons, it is ordered that this application seeking petitioner’s release from Wassaic Developmental Center is denied.